Case number 22-7010 et al. Rosalie Simon et al versus Republic of Hungary and Magyar Alambasutak GRT and Magyar GRT at balance. Mr. Silbert for the defendant at balance from Republic of Hungary et al. Mrs. L for the plaintiff's at police cross at balance Rosalie Simon et al and plaintiff's at balance Stephen Heller et al nationality issues. Mr. Weinstein for the plaintiff's at police cross at balance Rosalie Simon et al and plaintiff's at balance Stephen Heller et al. Lack of immunity under the 1920 Trianon Treaty. Good morning Mr. Silbert. You may proceed when you're ready. Thank you Your Honor. Good morning and may it please the court that Silbert for Hungary. So there are only two possibilities here. Either the plaintiffs were Hungarian nationals at the time of the alleged takings or the plaintiffs were not and either way there is no jurisdiction over their claims. If the plaintiffs were Hungarian nationals which is what they asserted and this court held in Simon 1 then there's no jurisdiction under the Supreme Court's decision in Philip. If plaintiffs were not Hungarian that means they were either Czechoslovak nationals or states. So let's first assume that there were Czechoslovak national plaintiffs. Now as we know we've argued in our briefs there were not Czechoslovak national plaintiffs but let's assume that there were some. In that event their claims would be barred by the treaty section because article 26 of the 1947 peace treaty provides the exclusive remedy for the same property losses that plaintiffs assert. But part of our reasoning in Simon 1 was that the treaty remedies the treaty of peace remedies were not exclusive and why doesn't that stand whether the plaintiffs fall under article 27 because under Hungarian jurisdiction which might not exclude people who are Czechoslovak nationals and or apply if they are Czechoslovak nationals and therefore governed by article 26. So thank you Judge Poehler for two reasons and as the court I think your question acknowledged Simon 1 made that determination as non-exclusivity as to article 27. Article 26 is a different provision. Article 40 also? Well article 40 was the provision of the treaty that involves state-to-state negotiations for disputes under article 27. There's a separate provision of the treaty that involves disputes under article 26 doesn't those are not fed to article 40. But I think most importantly there's unique facts of article 26 and also the court's analysis in Simon 1 depended very heavily on the plaintiff's Hungarian nationality. So let me begin with the text of article 26. There are several unique provisions of article 26 not in article 27 that show that article 26 was exclusive. Number one article 26.8 says that Hungary and the property owner may agree on alternative arrangements in lieu of the provisions of article 26. Now if article 26 were not exclusive and a claimant a plaintiff were free to assert claims for the same property losses without agreement by Hungary then a provision saying that the that the property owner and Hungary could agree on alternative arrangements would make no sense and do nothing. So that provision shows that article 26 is exclusive. In addition article 26 contains a substantive compromise of rights. It says that in in situations where the property cannot be returned which is what the plaintiff's alleged here that the the claimant will receive in Hungarian currency two-thirds of the replacement value of the property. Again if the plaintiffs were free to assert claims in another forum for a hundred percent of the value of the property which is what the plaintiffs are doing here that substantive compromise would have no effect right. If it article 26 says you get if you property cannot be returned you get two-thirds of the value of the property they have to be assuming that that provision will have some effect on the plaintiff's recovery and that means that the recovery is in article 26 and not an alternative forum. In addition to that the there is an express forum requirement and time requirement to bring the article 26 claims. So it says that article 26 says all these provisions that I'm referring again are unique to article 26 not in article 27 not in the court Simon 1 decision. Article 26 says the application shall be made to the Hungarian authorities. Obviously this application before you today was not made to the authorities. It also says that the application shall be made within one year of the coming into force of the treaty unless the claimants can show that it would not have been possible to bring the claim earlier. So article 26 unique facts contains a time requirement and a specific forum and again those provisions show that the intent of the treaty was for article 26 to provide an exclusive remedy. In addition to that those are all factual clues about article 26. In addition to that as we've said and as this court acknowledged in Simon 1 it is in the nature of a peace treaty to resolve claims by the signatory nations and their nationals against the belligerent nation. The only reason that the court found that article 27 was not an exclusive remedy was that article 27 addressed claims by Hungarian. I don't read that to be the only reason. I think that they said in its terms it wasn't exclusive and the same could be said about 26. I appreciate the arguments you've made about the text. Fair enough. That decision's been vacated. Yes it has. So what precedential value? Well Simon 1 no Simon Simon 2 was vacated. Simon 1 was not vacated. The holding of Simon 1 was reversed and filled but the decision itself has not been. To what extent does the executive agreement bear on your on the executive agreement the 1947? No it's 1973 wasn't it? Oh the 1973 treaty. The 1973 treaty is an example of a state-to-state negotiation under the terms of article 26 that show how article 26 is enforced. So article 26 it gives a private right of action for claimants to seek redress from Hungary by applying to the Hungarian authorities. The treaty also says that if there's any dispute about the rights under article 26 then there is a state-to-state process by which the interested governments can resolve claims for themselves and their nationals. So there's been a number of those state-to-state agreements pursuant to article 26 where in addition to whatever private claims were made Hungary paid additional restitution to the governments of nationals whose property was taken. And that executive agreement that your honor refers to the 1973 agreement is one such agreement between Hungary and the United States. Hungary entered into other article 26 agreements with other nations including the United Kingdom, including Canada, a number of different nations. So there have been in addition to whatever private claims were paid there was a number of payments made under those state-to-state agreements. What that shows again is that the scheme that is envisioned by article 26 is a scheme of direct claims made to the Hungarian authorities or alternatively state-to-state negotiations. It leaves no room for the litigation that you have in front of you which complies with none of the restrictions of article 26. It does not meet the form requirement, does not meet the time requirement, and it is not said that they would be limited to two-thirds of the value of the claim. This is a separate kind of proceeding to address the exact same property losses that article 26 is about. You argued quite at length about the commercial nexus requirement and the question of tracing the property that plaintiffs have identified back to the originally expropriated property. If the burden is as you say on the plaintiff from beginning to end wouldn't that effectively nullify the FSIA's expropriation exception? If just all a nation state would need to do is liquidate the property and it would become impossible to trace. And as I understood that there's a burden shift to take account of that where the plaintiff needs to come forward but then the burden is on the nation state to show that the property is not traceable, is traceable. Thank you. So it's that provision. This is a statute of interpretation question. So the analysis begins with the text of the statute. The relevant text is property exchanged for such. So there has to be an exchange relationship, a path of exchange that exists between the property that the plaintiffs rely on to create FSIA jurisdiction and the specific property that was taken from a plaintiff. Now your honor asked about the burdens there and nullification. Two points on that. First point, remember this is a foreign huge lawsuit, right? This is a foreign, the allegation is that a foreign defendant armed a foreign plaintiff in a foreign court, right? So in the ordinary course there would be no U.S. jurisdiction over that kind of thing. For U.S. jurisdiction to exist, which is the exception, there would have to be some kind of substantial connection to the United States. And that's what this exchange relationship gets at, right? So as to what that connection is and then what the burden is, it's not any property in a sovereign's possession after an expropriation that creates a substantial connection between the United States and wrongdoing that occurred decades earlier. So the defendant would be able to show, no, no, the property in question does not trace back, U.S. property does not trace back to the expropriated property because here's what we did with the expropriated property has nothing to do with these contemporary connections with the U.S. that the plaintiffs are pointing to. I mean, that's something that is really only in the capability of the defendants to do. And so if a defendant wanted to protect against, I mean, there are many situations in which defendants, nation states, companies, individuals want to shield themselves from jurisdiction, but they're the only ones who are really in a position to make that showing. And in the absence of that, you know, doesn't our case law basically say you've commingled and now you have this commercial relationship raises a presumption that's on the defendant's butt that there is this, that the commercial activities of the defendant are using those. So I don't think this court's case law goes so far, Judge Pillard, but even if it did, this court's case law that you're referring to, I think Simon one is before Helmrich, right? So remember, then we have the intervening decision by the Supreme Court and Helmrich and Helmrich said, it's not enough that there might be jurisdiction or that you have a good argument that the jurisdictional facts are present. You have to show that the plaintiff has to make any valid claim that the jurisdictional facts are in fact true, right? Eventually the facts have to be proved and it is on the district court to establish the jurisdictional facts early. So were we to remand, it would be up to the district court as a factual matter to play But I'm not sure I agree with your reading of Helmrich. It seems to me that Helmrich is about the distinct situation where the merits and the jurisdictional issue really are overlapping. And we, I guess, you know, looked for some way to see daylight between those and said, well, plausible claim a la Bell v. Hood is enough to establish jurisdiction and then you have to have in legal terms, whether something is plausible or valid. I don't think it touches the the twig ball, if you will, plausibility standard, which is about facts. And I take your point that the facts, we're in an immunity domain. So the facts need to be resolved, but those haven't been resolved by the district court here. And why isn't it open to the district court? And in fact, obligation of the district court to address this next question as a factual matter based on the claim. So there's sort of two questions there. Let me take them in turn, your honor. I understand, I think, the reading of the Helmrich that you're pointing to. There's some additional language in Helmrich that talks about kind of the affront to a foreign sovereign of exercising jurisdiction over claims when the jurisdictional facts are not actually there, not actually present. The predicates for jurisdiction might exist but don't actually exist. So let me take that back to the statutory language. The statutory language is property exchanged for such property. So there has to actually be an exchange relationship between those two pieces of property. But that's something that just can't be resolved other than through factual determination. Well, if there's, if it's plausibly pleaded and that's the discussion we were having about the that goes exactly to the burden shifting framework that you mentioned earlier. The initial burden, as this court said in WYO, is on the plaintiffs. And plaintiffs have to both make allegations and produce evidence that an exception applies. At that point, the burden shifts to Hungary. So we don't think, with respect to property tracing, that the plaintiffs have alleged or produced evidence that any exchange relationship exists between property in the United States and Hungary's property. But even if they had, Hungary did produce evidence, as the district court noted, from a number of respective scholars showing that it would be impossible to trace any property in the United States or currently in Hungary's possession to property that was expropriated from these named plaintiffs. But I think we can agree that the district court has not made fact findings on this. The district court, I think, erroneously rested on allegations on this point, where if the pleading is sufficient, she needs to go a step further. Do you agree with that? I do agree with that. I don't think the pleadings were sufficient. I hear you. Yeah. I know you know our point on that, Your Honor. And I would just say that Your Honor's property tracing, but of other, that's true, including the court's findings of Czechoslovak nationality, right? The court said, well, it's not impossible that somebody might have been a Czechoslovak national, but that wouldn't do it. If she is going to pin jurisdiction on Czechoslovak nationality, which again, we don't think she can, for the reasons I started with, to the exception, it would have to be an actual finding that the plaintiffs were Czechoslovak nationals, not just that the pleadings don't 100% exclude that possibility, which is essentially what she found. And on that, on the Czechoslovak nationality, you lean heavily on this permit requirement. But aren't you over-reading that to apply to plaintiffs in this situation? Doesn't Article 62 and the permit requirement you talk about just apply to individuals who acquired rights of citizenship of the state that previously controlled the territory, for instance, Hungary, between 1910 and 1918? I think that means acquired rights of citizenship in Czechoslovakia after 1910, which all of these plaintiffs would have, because they were born after 1910. What if they acquired them after 1918? I don't think there's no, it just says anyone who acquired rights of citizenship after 1910, which would be all of these plaintiffs. And then the thing about Article 62 that is significant is it applies the permit requirements specifically to people who have acquired rights of citizenship in territory that was ceded to Czechoslovakia by the Trianon Treaty. So it's not, it's not all of Czechoslovakia. It's that specific territory. And if you look at page 22 of the plaintiff's reply or certify, I guess it is, they tell you that the territory that they're talking about, sub-Carpathian Ruthenia, was ceded by the Trianon Treaty, and they give you some specific treaty provisions to do that. So that Article 62, I'm sorry. I think I have my dates and my sequence wrong. But when I was reading the briefs, my impression was that it wasn't clear that that requirement of getting a permit was applicable. I believe that it is. I don't think that even the plaintiffs have argued any kind of date restriction on that provision. So I don't think that issue is before you. But even if you wanted to raise it to respond today, I think that what the, I don't have it right there in front of me. But I think what the, what that provision says is acquired rights of citizenship after 1910, which all of these plaintiffs would have. And what's your position with respect to statelessness? You started out earlier. Thank you very much, Judge Chauncey. I know we're almost out of time here. But we'll give you time. Thank you, Judge Bode. I appreciate it. So as to statelessness, here's what the Supreme Court said. It said, a taking of a foreigner's property implicates the international legal system because it constitutes an injury to the alien state of nationality. And that is the principle of international law that is reflected in the domestic takings court. So a stateless person, by definition, is someone who does not have a state of nationality, right? So a taking from a stateless person is an injury to that individual. It is not an injury to another sovereign state. And the international law of expropriation is triggered solely by injuries to another sovereign state. That's what the third restatement tells you explicitly at Section 713. Our friends on the other side, they point you to the second restatement, Section 175. That provision also refutes their own. Okay? So if you look at Section 175, it's in the sequence 174, 175, right? 174. And these are general provisions about international law overall, not the law of expropriation in particular. But even as to international law generally, Section 174 says a violation of international law may be asserted by the nation of which the individual is a national, but not any other nation, right? And then 175 follows up and says it may not be asserted by an individual against the state except, and then it gives you three exceptions, right? A, B, and C. Now, none of those exceptions are the international law of expropriation, which is, as the Supreme Court told us in Phillips, the body of law that the expropriation exception rests. So I have a question that may or may not be a bit academic. Okay. I mean, I take it that on whatever theory of statelessness the plaintiffs here want to proceed, they have to point to law. Like the customary international law to support it. And they may, that's a secret. But just conceptually, isn't the question about whether you're stateless or the national of another state, doesn't that go more to remedy than to the illegality or not of the taking? In other words, international law remits individuals to state-to-state discourse to receive relief. So someone who is stateless might not have a remedy under international law because they have no sponsor, no state to speak for them. But arguably, the Foreign Sovereign Immunities Act is itself a congressionally created remedy. And therefore, if I'm right in my suggestion that the expropriation may be just as unlawful, but not have a remedy in international law itself, why wouldn't that suffice to provide a remedy? If the FSIA explicitly creates one. So it's more than remedy, Ronna. International law governs the relation between states. Now, as the Supreme Court told us in Philip, after the war in particular, there were some developments, especially in the areas of human rights law, where international law came to address the treatment of individuals. In the human rights context. But in the property context, which is the context that's relevant here for expropriation, international law governs the relationship between sovereign states. So if there is no affront to another sovereign state, there is no violation of international law. There may be violations of local law, as Article 175 tells us, or maybe if there's a separate treaty or a local law or agreement with an individual, that may allow an individual to have rights or claims. But international law itself requires a relationship between two sovereign states. That's what the Fifth Circuit, I'm sorry, the Eleventh Circuit explained in Messerhain. And it's what Supreme Court held in Philip when it addressed the expropriation exception, right? Injury to another sovereign. And within international law, the individual and his or her property have no independent existence. It's the sovereigns. It's the... Isn't it also the case, at least I think we know, that FISA is not a remedy statute. It's a jurisdictional statute. Exactly. And in order to obtain jurisdiction, you have to, because of sovereign immunity, you have to fit yourself within one of the exceptions. One of the exceptions is expropriation. But the Supreme Court held that the expropriation exception doesn't apply if the individual is not a citizen of another state. That is exactly correct, Your Honor. And that was the second leg of my answer to your question, just so I didn't get to it. But you said it, Judge Randolph. So in McKesson, this court held that the FSIA does not provide any remedy. It's purely a jurisdictional statute. And so it can't be that the FSIA provides a remedy or a cause of action for a claim that would otherwise lack the remedy. But more importantly, jurisdictionally, as Judge Randolph said, there has to be a violation of international law. The international law regulates the relationship between states. If one nation takes property of the national of another nation, it reduces the wealth of the other nation. And therefore, it is in front to that other nation. And therefore, the Supreme Court told us in Phillips, it implicates international law. If a nation takes property from its own national or a stateless person, that may be a grave injustice to that individual. And we all know there were grave injustices committed here. But it is not in violation of international law because it does not. Before you stand, on the judicial stop, what is the prejudice that your clients would experience I mean, the elements of judicial stopover. One of the elements is prejudice to the party. Well, that's right, Your Honor. I think unfairness, I think, is the way that the way the test puts it. I think, you know, remember the very first decision in this case was a decision that dismissed the complaint. And this court, in time one, the very first appeal, we're now on appeal number three, right? But in the very first appeal, this court reversed that decision, sent the entire case back. And you had a sovereign defendant litigating for a number of years now at every level of the federal court system, district court, district court, Supreme Court, all based on the premise that these places were Hungarian nationals. I don't think there's any way you can read time in one. And I take your point, Your Honor, there was more to that decision. But repeatedly, in Judge Srinivasan's decision there, the court says these were Hungarian nationals. The Article 27 is a fundamentally different provision because it deals with Hungarian nationals. But as the district court held, you know, this is a balance of equities. And we look at that under a discretion standard. And I mean, the up and down to our court and to the Supreme Court is a prerogative of your client. It's not, you know, a requirement for the state and the district court to have factual determinations and perhaps done a long, long time ago. So, you know, we're reviewing this issue on an abusive discretion standard, right? You are, Your Honor, and in Arab laws, of course, always abusive discretion with respect to finishing out to Judge Randolph's question about unfairness or prejudice. I think you have to view this. Well, I just want to follow up on that because I wondered what we're dealing with is a sovereign immunity step. Exactly. Right. And there are plenty of cases, Harlow v. Fitzgerald comes to my mind, a Supreme Court decision that talks about what the prejudice is for someone who claims immunity and yet has to go through discovery and so on and so forth. And the whole purpose of sovereign immunity is to prevent that. So the very fact that you have to go again for the third time is prejudicial under Supreme Court precedents, including Harlow v. Fitzgerald, because you're being required to do something that sovereign immunity is supposed to prevent. Thank you, Judge Randolph. That was the point that I was going to try to make. I don't think I would have made it as eloquently as you would have. But yeah, that was exactly it. So you have to view the prejudice question in the context of the FSIA. And the basic objective of the FSIA is to free foreign sovereign defendants from suit, not just from liability, but from suit. And so to hail a foreign sovereign into a U.S. court, require the foreign sovereign to participate in discovery and litigation, to bear the expense, to bear what is viewed as an affront to the sovereign power of another nation, to submit itself to the courts of the United States, those are issues that all nations face with respect to one another. There are standards that are set by the FSIA. And those standards are generally that a sovereign defendant should be freed from suit as soon as possible when a defense is available. And so I think the whole premise of Simon 1 was that they were Hungarian nationals. Now, if you're suddenly saying they're not, then we've been subjected to years of litigation without any basis. That adds up to prejudice for purposes of the FSIA. All right. We will give you some advice on this. But what's the additional discovery that would have to be indicated? Well, I think that goes to Judge Pillard's observation before, that the district courts seem to base its conclusions on the readings and not on actual fact-finding. There already was discovery. So I don't know that there would be an opportunity for additional discovery. But certainly, the district court would have to find facts. Here, the court said, well, if you look at this place, it says that they were born at some point in Ruthania. So it's not impossible that their parents lived in Ruthania 10, 20 years earlier. That's not a finding of fact, right? And Judge Pillard is, I think we certainly agree on this point, Judge Pillard, for the court to assume jurisdiction, the facts must actually show that all of the jurisdictional prerequisites are satisfied. That includes... So that discovery was affected on the nationality issue? There was, well, there was discovery. There was discovery. I don't know that, frankly, there was, that either side had, we don't have facts about the place nationality. I don't know that they put in discovery about the actual individual places nationally. But my colleague here who is trial counsel may correct me on that when we sit down. And I may come back here and revise that when I come up again. But I don't know, as I stand here right now, I don't know if there was specific discovery on that. There was discovery on other issues, including property tracing. So... Thank you. Thank you. Good morning, Mr. Zell. Good morning, Judge Pillard. And may it please the court. Before I respond to my friend's comments during his oral argument, I'd like to note that we have with us today some special guests. The family of Rosalie Simon, the lead name plaintiff in this case. Rosalie herself could not be here because she's teaching high school students about the Holocaust on this Holocaust Remembrance Day. But she is, she did send her children, Mitch and Ruth Simon, and her daughter-in-law, Deborah Cohen Simon, and her great-grandson, who's writing a report about this case, Lewis Simon. Also with us today is the daughter of another named plaintiff in this case, Rosalie's sister, Charlotte Weiss. Your Honors, may I also say that to represent, my name is Mark Zell, and I'm representing the plaintiffs along with my colleague, David Weinstein. And we welcome you all to court today. Thank you for being here. And my colleagues, Chuck Fax, and Paul Gaston. Your Honors, just a few hours ago in my home in Israel, millions of people rocked everything they were doing, even the lighting from their vehicles in the middle of the highway, the stand in silence, for the memory of the six million. Today, amazingly, when we're hearing these arguments, is Yom HaShoah, called against Holocaust Remembrance Day. Before I address the issues of statelessness and nationality under Philip, I'd like to respond quickly to some points that my colleague, my friend, made during his oral argument regarding the rules of international law, expropriation law, under the Restatement Second. First, I would point out, very clear from the Philip opinion, that the source, the proper source or description of international law as it existed at the time the Foreign Sovereign Immunities Act was enacted in 1976, is not the third restatement, but rather the second restatement. And the second restatement has, and this was quoted by the Supreme Court in Philip, two sections that are directly pertinent. These are the sections quoted by the Supreme Court in Philip. One is Section 185, which says that the taking by a state of property of an alien, I'll come back to that point in a moment, is wrongful under international law. If either it is not for a public purpose, and we would add under Section 166 of that same restatement, is discriminatory. And discriminatory, the concept of discrimination is described in the Restatement Second, and it clearly applies to the facts of this case. And also you have to show, or you may show that there's not been just compensation, so on, that definitely hasn't happened in this case. The Philip Court also cited Restatement Section 192, which defines the meaning of taking a principle of international expropriation law. And that says the conduct attributable to a state that is intended to and does effectively deprive an alien of substantially all the benefit of his interest in property that constitutes a taking in violation of international law. But Mr. Zell, under the second restatement, you're right that there are these references to a person being an alien for purposes of the responsibility of the state for the injury under the domestic takings rule. But it also goes on, and this is the second restatement in Section 175, to talk about responsibility of a state under international law for an injury to an alien. And Comment D of Section 175 specifically references that a stateless alien is without a remedy since there is no state withstanding to espouse this claim. So, Your Honor asked the question along these lines during my colleague's argument, and I think Your Honor put her finger on it correctly. When she suggested that the qualifications in Section 175 go to remedies under international law, but they don't contradict what Congress did under the FSIA in 1976. Recall that the Supreme Court in Phillip also said that the expropriation exception is unique in the world in terms of state practice and international expropriation law. There are no other countries in the earth that have a provision in their law limiting immunity in the case of expropriations as we do here in the United States. When Congress enacted that particular exception, it was cognizant of the situation in the state of international law and nevertheless clearly created the possibility of an action. In other words, and here I have to clarify again, the Foreign Sovereign Immunities Act, Judge Randolph, is not only a jurisdictional statute. It has jurisdictional ramifications, but it deals, as Justice Kagan said recently in the Kassirer case, that it deals with the amenability of foreign sovereigns. That is the core of the statute. Of course, if they are within an exception, then the court has jurisdiction to proceed under Section 1330, Title 28, but Section 175 is a remedial concept, and it doesn't say, and it goes on to say, by the way, that the responsibility of the state under international law for an entry to an alien cannot be invoked directly by the alien. This is not only stateless aliens, but any alien against the state except as provided by the law of the expropriating state. International agreement about which my colleague David Warrenson will have more to say during his argument and an agreement between the state and the aliens does not exist here. So you're relying on B there? No, we will be relying on B. I'm not arguing that particular point at the moment. This is dealing with the effect of the Triennale Treaty of 1920 on this section, but we are relying on the expropriation exception of the FSIA, okay? So think about this. So how does that fit within 175? Because the FSIA itself incorporates a requirement that the property be taken in violation of international law, and the Supreme Court was well cognizant of the point that you just made about the uniqueness of the FSIA piercing of national immunity for purposes of recovering for expropriations. It was quite attentive to keeping that extraordinary cause of action narrow. And so I guess the bottom line question is where in customary international law is there any support for the notion that a stateless individual would be outside of the domestic taking rule? I have a couple of answers to that. The first one that deals with Section 171 of the Restatement Second, which defines the term alien. And when you look at that particular section, you'll see that it clearly defines it in a way, a person is an alien for purposes of the responsibility of a state for entry to an alien relating to the issues in Section 175 if he is not a national of the respondent state. Now, and then it goes on to say in comment G to that very section, Your Honors, that a stateless person comes within the definition of alien, but the responsibility is limited as provided in Section 175. And our argument is under Section 175, Congress has superseded customary international law on this point by allowing an alien, including stateless aliens, to bring a claim against a respondent foreign state. And what I'd like to add to that is that what would happen? I mean, let's take the case of a foreign national. Let me just stop you there, though, because if you say that Congress has superseded customary international law, it seems to me that that would have given a platform to plaintiffs in Phillip and given them a remedy that would have negated the Supreme Court's narrowing reading. I respectfully don't agree. But what Congress did in enacting this exception, let's take the example that I think will illustrate this point. Suppose the alien we're talking about is not a stateless alien, but rather a citizen of a foreign state other than the respondent state. Okay? Under the reading that we have in Section 175, that alien would also not have a recourse or remedy under international law. Well, international law supports, and I think that this is clearest in Helmreich, we walk through why expropriation is a violation of international law. So there is established law that an expropriation by one nation-state of the property of a national of another nation-state is in violation of international law. That's true. You recall my colleague citing the language in Phillip, which is basically the sort of Chief Justice Roberts was reviewing the genesis of the domestic taking school. Said that under international law, individuals in the traditional sense were never the subjects of international law. Only states had rights under international law, and individuals couldn't bring action. That changed with the Congress' enactment of the FSA. I think it was an extraordinary provision. And it's true that Phillip says we have to be careful about extending it. But at the same time, we can't deny the fact that aliens who are the victims of an expropriation, either because they're citizens of a foreign state or stateless, now have recourse under, at least they have the right to argue that the respondent state no longer is entitled to immunity. Now, whether they have a cause of action, that's not something that the FSA ideas. Let me ask you more concretely about the claims, the claims that the dismiss. On the Lubovitch sisters, if we were to look at Article 6 of the Saint-Germain Treaty as a place to start to determine the non-dismissed survivor's nationality, have the Lubovitch sisters plausibly alleged that they would have acquired Czechoslovakian nationality pursuant to that provision? And if so, exactly where would you point that? Let me, that's an excellent question. Let me, let me answer it in this way. The Saint-Germain Treaty of September 10th, 1919, provided, and the China Treaty in Article 61 really says that anyone residing in the territories that are received by the former Kingdom of Hungary to the newly formed state of Czechoslovakia, and by the way, let me just point them out on this. The purple areas, the deep purple areas and the light blue areas on the map are the areas we're talking about. All those areas were part of Czechoslovakia until Hungary illegally invaded them in 1938 and 1939 and purported to annex them, but the annexation was never recognized by the government of the United States or the Allied powers in World War II. In any case, what the Saint-Germain Treaty says and what the Triangle Treaty also says is if you were a resident of these areas in the, at the time that the state of Czechoslovakia was formed, which was 1918, and then let's say that we'll extend that to 1920 because that's when the actual nationality law was enacted by the Czechoslovak state. Those people became citizens of Czechoslovakia notwithstanding the fact that they were Hungarian citizens beforehand. Now, by the way, just so we're clear on the chronology here, none of the named plaintiffs was alive when Czechoslovakia became a state. The oldest one, the oldest of the Lebovich sisters, Helen, who makes you rest in peace, was born in 1922, and Rosalie Simon was born in 1931, okay, and Charlotte Weiss was born in 1928. I don't remember the exact date. Okay, all of them were born in Czechoslovakia. Now, there is a provision, which my colleague referred to, completely out of context, and I'll address this in our brief, that Article 62 of the China Treaty says if you were a person that came into these areas between 1910 and 1918, then you needed to get the permission of Czechoslovakia to obtain Czechoslovakian citizenship, but if your parents, for example, were living in those areas before 1910, and you were born to such parents after the Czechoslovakian state arose, you were a Czechoslovakian citizen. Do we have an allegation that the Lebovich sisters were born in Czechoslovakia? You just stated that they were all born in Czechoslovakia, but I didn't see an allegation. There is an allegation that they were born in a particular town called Tarakčač, I think is the name, and the court can take judicial notice of the fact that that town was in some part of Ruthenia, and that's the case with all of the other nine. In particular, I'd just like to point out that there is in the record two very interesting declarations, the Joint Appendix 212 and the Joint Appendix 226. One is by Jafa Prokhor Daskal, who was born in those areas, and also Sviza Lebovich, who the district court mistakenly excluded from the class of the plaintiffs who were allowed to continue. Both of those declarations state specifically that their parents were born in these areas and would give you a date of birth, 1899, 1895, whatever. For the Lebovich sisters, it says they were raised in Tarakčač. Okay. It doesn't say they were born there. Okay. Your Honor, when this lawsuit was filed, and when these declarations were filed, the law about nationality in terms of domestic takings rule was unsettled around the country and in this circuit. All the indications were based on the Kabad case in 2008, that this circuit was going to take a different approach. And the Seventh Circuit, in the Ambulance case and the Fisher case afterwards, also took the position that the domestic takings rule wasn't that successful. And you took that position that your clients were Hungarian, as a result of which the Simon One opinion spent four or five pages dealing with the 1947 treaty, as a result of your representations. Your Honor, with due respect, we never, except perhaps in one oblique reference in a reply memorandum, certainly not in the Second Amendment complaint, we never, but the Second Amendment complaint wasn't filed until after Simon, of course, but we never contended that our clients were all Hungarian. In essence, it just wasn't necessary. We did say. Well, it was necessary. No. It was necessary, maybe not under the expropriation law in this circuit at the time, but it was necessary to sort out the treaty up. Okay. Is that right? No. And again, I'm sorry to disagree with you. Okay. The treaty obligation that Simon One Court focused on was Article 27. And what is the operative language in Article 27, Your Honor? Persons under Hungarian jurisdiction. It doesn't say anything about a Hungarian national. Persons under Hungarian jurisdiction. All of the plaintiffs in this case, all of them were under Hungarian jurisdiction to their chagrin when these mass expropriations took place in 1941 and 1944. Because the greater Hungary had annexed. Had attacked these areas and annexed them illegally. Yes. In 1938 and 1939. That's exactly the fact. They were under Hungarian jurisdiction. The court in Simon One was imprecise when it said in the opening paragraph to the decision that 14 plaintiffs, all the main plaintiffs were Hungarian nationals, simply not true. And they were not. And it wasn't really necessary for the court to delve into that. The only important point was the expropriated property was located, and the people themselves were located in these illegally annexed areas. The light blue and the purple. And that is the case. I don't mean to disagree with you, Judge Randolph, but I'm trying to. Oh, that's a good point. There's a lot of imprecision on both sides. Right. Okay. Frankly, in this case, it's confusing. And the law is shifting. We've had, since Simon One, we've had Helmerich, we've had Phillip, and now last year, Kassir, where the plaintiff in Kassir was a German national whose property was expropriated by Germany and the Supreme Court, but then it went and reached the issue of choice of law after trial. Yeah, but they never addressed the questions. Well, they didn't address it specifically, but that's the underlying predicate. Okay. And they must have been very well aware of it. The other thing I'd like to point out is that during oral argument on the Phillip case, something's very interesting. When you look at the transcripts of the oral argument, I have them here. Four, probably five of the justices all asked questions about what would be the result if Hungary or Germany, in the case of Phillip, completely stripped these plaintiffs of their citizenship. So why would they ask that question? I would think the judge, Justice Gorsuch, in our case, in the argument to ask our counsel, that question, unless a page of the transcript deals with this precise question, our counsel had to say, listen, Your Honor, that issue is not before the court now. Okay. It wasn't briefed. It wasn't raised. And certainly in the Simon case, it wasn't presented, but we need to deal with it on remand. If the court had wanted to say that these kinds of inquiries are not permitted beyond the expropriation exception, it could easily have done so. Rather, they didn't do that. They specifically remanded Phillip, in our case, for a determination on the question of nationality. Mr. Zell, let me just ask you, on the question of Hungary's commercial activity, do you need us to reach both the issuance of bonds and military purchases, or would it have any effect on the litigation going forward if we were to only reach one? With your permission, Your Honor, I'd like to defer to that question to my colleague, because that's one of the areas of this bailiwick. All right. Thank you. Thank you. And we'll hear now from Mr. Weinstein. And thank you for asking that question. May it please the Court, I am David Weinstein, Co-Counsel with Mr. Zell and Husserl's Facts, and passed it. I expected to start off by talking about the Treaty of Priena, the 1920 treaty, which provides an additional reason why Hungary has no immunity in this case. However, I do want to address as well the concerns of you members of the panel who have raised questions about the treaty exception and whether or not it is applicable here. And since the panel had questions about that, I'd like to put it to rest. First of all, we know that Article 26 does not explicitly say that it is providing an exclusive remedy. That's a conclusion that Hungary would like the Court to draw from what's in the treaty. They do not, however, look to other provisions in the treaty. And I'm referring specifically to Article 27. If indeed Article 26 were exclusive, Article 27 would not have been written the way it is. Article 27 talks in terms of all cases, let's see, of persons under Hungarian jurisdiction, irrespective of their nationality. So it is clear that Article 27 would not be dealing with all cases of discriminatory taking if, in fact, the intention was not to include all cases, but instead to look or require the parties to look exclusively to Article 26. And consequently, it cannot be the case that Article 26 is an exclusive provision. And indeed, there would have been no need for the 1973 Executive Agreement, Judge Randolph, as you asked, if, in fact, Article 26 were exclusive. On the contrary, it would be a nullity because Article 26 would have been exclusive. So with that put to rest, I do want to come back to the Trinon Treaty, because it provides a separate additional reason why there's no immunity. The Trinon Treaty is the treaty between the Allied Powers and Hungary at the end of the First World War. There were similar treaties entered into by the Allied Powers with other countries, including, for example, Austria and Czechoslovakia. The portion of the treaty specifically refers to the protection of minorities. And if, well, let me put it this way. Article 58 specifically says, Hungarian nationals who belong to racial, religious, or linguistic minorities shall enjoy the same treatment and security in law and in It doesn't say, oh, except with regard to property, or except with right to vote, or any other condition of rationale. So the difficulty, I think, is with the Supreme Court's decision in Phillips. And I mean, I hear you that the reading, that the rationale there is, you know, we're going set aside as a potential source of international law, international human rights law, and we're going to look only to international law, meaning state-to-state law. And a treaty is state-to-state in that sense. So that would support your reliance on Trinon. But the court also repeatedly, repeatedly, and in material ways in the Phillips opinion, refers to the international law of expropriation as the only international law that the expropriation exception refers to. And I don't see any reference in the Trinon Treaty provisions you say to property, to expropriation. It's hard to see it as a source of international law of expropriation. Well, the answer from our perspective, Your Honor, is that all cases means all cases. And that has to include a subset of the all cases being those cases involving property. It's, by its nature, that vision is exclusive in the sense of saying every kind of case. So whether or not it might also refer to what Your Honor has called human rights law, it doesn't eliminate the fact that it also involves property rights. And it's the taking of rights in property in violation of international law that Section 1605A3 says. Okay? And we are saying that this involves rights in property. And it's also clear that the treaty, by its expressed vision, says that it is addressing matters of international concern. So we, as Your Honor indicated, we are aware that this is a matter of international, state to state, legal provision. Your Honor, I had asked Mr. Sell a question in a different area of the law having to do with the commercial exception. And he deferred any questioning of that to me. And I'd be prepared to address. I would appreciate your restating it. It's a little bit harder for me to hear the question when I'm sitting over at counsel's table. But I certainly don't want that question to go unanswered. So I guess the question that I had asked Mr. Sell was whether it has implications for the if we were to accept your allegations about commercial nexus, whether we would look to the issuance of the bonds vis-a-vis the United States or the military purchases. Does it matter if we accept only one for the case, for the litigation or the litigation to proceed? Two bases. I think the answer to it is at least at this stage, the district court made a factual finding based upon stipulated evidence that there was limited discovery. And that can answer the question you asked opposing counsel. There was limited discovery in this case only after the second remand. And it was to develop the question of that your honor has addressed today. That is to say whether there was commercial activity. And the parties resolved much of that with a stipulation when we got into a debate about the motion to compel production of evidence that we had to file because of objections filed by Hungary. It was all resolved by a rather extensive stipulation that's in the record. And the evidence therefore is there. So whether one later on will need to do anything further on that specific point is probably doubtful at this point because that is a stipulation of the parties as to the fact. So therefore the military purchases and the sale of bonds in the United States are fact. But the defendants point to in terms of the military purchases, whether that is really the kind of activity that would fall outside the restrictive theory of immunity and with respect to the sale of bonds, they assert that there's an intermediary that's really responsible for that. So there are issues where they're defending against one or the other in ways that have to do with, I think, as yet unresolved legal questions. There may be undeveloped questions in regard to the agency, but I'm not so sure that that's the case because the evidence of agency, for example, that the entity that allegedly issued the bonds didn't because they were issued in the name of the Republic of Hungary and the person from the alleged agency actually was signing in his capacity as the attorney for the Republic of Hungary. Those kinds of factual questions are there. If after remand there still remains some lacuna of evidence that needs to be developed, I'm sure the district court can address those issues. But I believe what remain are the conclusions that Judge Howell reached concerning what actually was the case. And the other issues are legal issues that are already squarely before the court in our briefs and Hungary's briefs. All right. So if I may just, in conclusion, we ask that the court affirm the denial of the motion to dismiss with respect to those survivors who were from Czechoslovakian territory. And we ask that the court vacate the dismissal with respect to all other plaintiffs, both in this case and in the Heller case, the case be remanded for further proceedings, including finally an answer to be filed by the two defendants. Thank you, Your Honor. Thank you. So I believe that we, Mr. Silbert ran out of time. But as I said, we would give you some time for rebuttal. We'll give you three minutes. Thank you, Your Honor. I appreciate that. And I will try to be quick. I believe I heard my friend, Mr. Zell, clarify the plaintiff's position that Congress superseded customary international law in the SIA. I don't think that can be right. It expressly incorporated international law. And that was clear in the Supreme Court's decision in Philip. Judge Randolph, you asked whether it mattered, was necessary that the plaintiffs were Hungarian nationals for purposes of the argument in Simon 1. It absolutely does. And one reason you can see that is by reading Section 26 of the 1947 peace agreement. It deals specifically with the case of Czechoslovak nationals who lost property by reason of force or duress in territory that was annexed by Hungary. You can see from the map that the plaintiffs had brought you that they lived in exactly that territory. So if they were Czechoslovak nationals rather than Hungarian nationals, then by the expressed terms of Article 26, their claims would be covered by Article 26, not by Article 27, which is the provision the court analyzed. Did they argue that Article 26 was relevant to their claims? They did, Your Honor. And that relates to their response to your question about the executive agreement. So I think what I believe I heard Mr. Weinstein say here is that those executive agreements were separate from Article 26. They were not. And in fact, in the plaintiff's reply brief, and we quote this in Simon 1, and we quote this to you at page, I believe it is 48, but I know the clerks will check me on our reply brief, the plaintiffs argued that those international agreements, including the 1973 executive agreement, all relate to Article 26. They were right the first time. Those are agreements that are addressing Article 26 rights. Nothing in Article 26 prevents state-to-state negotiations about rights covered by Article 26. In fact, there's another provision, Your Honor, Judge Pillard, you mentioned Article 40 earlier. There's a different provision. It's Article 35 of the 1947 peace agreement deals with disputes involving Article 26. But all of these provisions allow for state-to-state negotiations and agreements with respect to those rights. What they don't allow for, Article 26 does not allow for, is a private cause of action in a United States court for the same property rights that are addressed by Article 26. Yes. I'd like to hear your response to the argument about the restatements of 171 and 175 and aliens. So for some purposes, a stateless person may be considered an alien because he or she is not a national of that state. But the international law of expropriation, the Supreme Court told us, is implicated because the taking of property from the foreigner constitutes an injury to the foreigner's state of nationality. And in Comment D of Section 175, which is the very comment that my friends, the Plaintiffs, rely on, it says a stateless person would have no remedy if they do not come within that exception. Now, I believe if you combine Mr. Zell's and Mr. Weinstein's argument, Mr. Zell confirmed that the provision of the exception of 175 that the Plaintiffs are relying on is D, treaty, right? And the treaty that they're relying on is the Trianon Treaty. And I think it was clear from the policy with Judge Pillard and others with Mr. Zell, the Trianon Treaty is not the customary international law of expropriation that the Supreme Court referenced in Phillips. So their 175 argument really comes down to their Trianon Treaty argument. They say the Trianon Treaty is what triggers the exception, but that Trianon Treaty, I'm not sure how to pronounce, but you know the treaty I mean, that treaty is not the customary international law of expropriation, which is the only law referenced by- You're not arguing that it can only be customary international law. If there were a treaty about expropriation, then that would apply under B. You're just saying this is not that treaty. That may be, Your Honor, but that question is not even before you. And it wasn't before the Supreme Court. It was not- It was not limited. We can't really fairly read the Supreme Court's bill of opinion to be limited to customary international law. That's just the only argument that was put there. Maybe true, Your Honor. But again, that question is not before you even in this appeal because the provisions of the Trianon Treaty that plaintiffs rely on, which specifically are Articles 55 and 58, make no reference to property. What the plaintiffs say is, well, they protect civil rights, political rights, free exercise. Those things may have been property protections. Okay, I don't see that. I think where the treaty addressed property rights, it said so. Those were the provisions dealing with UN nationals, right? But in any event, those provisions are not expropriation law. They are civil rights law and free exercise law. So under the Supreme Court's decision in Phillip, they do not come within the expropriation law. Thank you. Thank you, Your Honor. Thank you very much. And Mr. Zhao, I think you have one minute. Your Honor, one of the points that I was unable to make during my very extended argument, for which I thank you, concerns the position that our amicus curiae, Professor Vivian Kern, who's here today, but with us, and she made about the Phillip case before, two years before Phillip. She said time and one was not an appropriate interpretation of the rights and property in violation of international law language. Rather, she said, the appropriate focus needs to be on nationality. And the nationality issue, she said, needs to be resolved in what she described as a concept of substantive citizenship. I'll boil that down to one phrase. That is, the question is, with regard to the nationality of the Jews from Thailand and Hungary, that white area, did Hungary at the time of the expropriations in 1944, in their case, consider its Jewish population as Hungarian nationals? I submit to Your Honor that the answer to that question is unequivocally no. And with the result that those people were stateless, and for the reasons that I've discussed earlier, those stateless persons are outside the domestic taking school. Thank you, Your Honor. Thank you. The case is submitted.
judges: Pillard, Childs, Randolph